IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MARKET MODELS, INC. d/b/a ACCUDATA INTEGRATED MARKETING, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO.   10- _____ |
| RICHARD KING, BARBARA (DALE) KING | ) ) ) | |
| Defendants. | ) ) ) | |

VERIFIED COMPLAINT

Plaintiff, Market Models, Inc. d/b/a AccuData Integrated Marketing ("AccuData"), by and through its attorneys, brings this action against its former employees Richard King ("Mr. King") and his wife Barbara (Dale) King ("Mrs. King"), as follows:

INTRODUCTION

1.     This is an action for, among other things, injunctive relief and monetary damages for violation of the Computer Fraud and Abuse Act, theft of trade secrets, breaches of contract, breaches of fiduciary duty, and breach of the covenant of good faith and fair dealing arising from Mr. and Mrs. King's unauthorized access to, and misappropriation, distribution and use of AccuData's confidential, proprietary, and trade secret information. Specifically, AccuData has discovered that in late February, 2010, Mrs. King allowed Mr. King to access, without authorization and while he was on a company-approved medical leave, AccuData's computer and email system using her credentials.  Mr. King then

forwarded to a private AOL email account a substantial volume (120 documents plus attachments) of detailed trade secret and confidential and proprietary business information belonging to AccuData.  Mr. King's willful circumvention of AccuData's security measures while he was on medical leave was unauthorized and deceptive.  Nor was Mrs. King authorized to allow Mr. King  to access AccuData's systems and the confidential and proprietary information contained therein.  The defendants' actions were in direct violation of AccuData's policies. Moreover, Mr. King's actions, with Mrs. King's assistance, violated their statutory, contractual, common law, and fiduciary obligations.

It has now become apparent that Defendants' actions were designed to aid in their pursuit of business interests which are competitive with AccuData. Indeed, even before he went out on medical leave, Mr. King was promoting the services of another company, Webrecord, as a competitive alternative to AccuData's services.  He contacted clients prior to his termination and has contacted clients and prospects since his termination, using AccuData's stolen confidential information to do so, and in utter disregard for his express contractual obligations and fiduciary duties.

AccuData seeks to recover damages, including costs and attorneys' fees, and injunctive relief for: (i) Defendants' unauthorized access to AccuData's computerized confidential and proprietary business information; (ii) Defendants' knowing and willful misappropriation and wrongful use of AccuData's confidential information and trade secrets; (iii) Defendants' breaches of contract; (iv) Mr. King's breaches of fiduciary duty and Mrs. King's aiding and abetting of

same; (v) Defendants' breach of the implied covenant of good faith and fair dealing; and (vi) injunctive relief enjoining Defendants from further use or disclosure of AccuData's confidential and trade secret information.

## PARTIES AND JURISDICTION

2.     AccuData is a Delaware corporation with a principal place of business at 5220 Summerlin Commons Blvd, Suite 200, Fort Myers, FL.

3.     Defendant Richard King is an individual who resides at 468 Cotuit Bay Drive, Cotuit, MA.

4.     Defendant Barbara (Dale) King  is an individual who resides at 468 Cotuit Bay Drive, Cotuit, MA. Barbara King is Richard King's wife.

5.     This Court has jurisdiction over the subject matter of the complaint pursuant to 28 U.S.C. §§ 1331 and 1367.

6.     This Court has personal jurisdiction over the Defendants because they live in Cotuit, Massachusetts.  Defendants worked for AccuData out of their home office in Cotuit, Massachusetts and it was from that location that Defendants accessed and misappropriated AccuData's confidential and proprietary information, breached their contractual obligations, and breached their fiduciary duties (or aided and abetted the same).

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

8.     AccuData is a leader in database marketing services, through the use of a full range of data resources, powerful marketing analytics and database technology. AccuData helps clients develop lead generation strategies and implement

customized marketing solutions.   Based in Fort Myers, Florida, AccuData has clients in the printing, agency, energy/utilities, travel/hospitality, financial services, healthcare, ecommerce, retail and telecom industries.

9.      AlumniFinder is a division of AccuData.  Formed in 2001, AlumniFinder represents the most widely accepted locate-and-research service available for colleges and universities throughout the United States. Since 2002, top U.S. Colleges and Universities have used AlumniFinder to locate lost alumni, update name changes, acquire telephone numbers, identify deceased persons, obtain email addresses, identify work locations, view property ownership, and score alumni by wealth.  The AlumniFinder service is available to non-profit and 501(c)(3) membership-based associations.  Using AlumniFinder's research service, university and non-profit development officers who are charged with soliciting donations from alumni are able to update alumni address, phone and other data in order to contact their alumni.  In this way, university Development Officers are able to solicit donations from the greatest number of alumni.

10.     Richard King was an AccuData employee from March 14, 2001 through March 9, 2010.  Mr. King served as the President, AlumniFinder Division of AccuData from March 14, 2001 through November 22, 2009 and as the Vice President of Business Development from November 23, 2009 through March 9, 2010.  During the period relevant to this matter, Mr. King worked out of his home office in Cotuit, Massachusetts.

11.     From at least 2005 through the date he began an FMLA leave on January 12, 2010, Mr. King was responsible for negotiating contracts with AlumniFinder's

vendors, financial reporting, and reporting on the sales pipeline. He had frontline

sales responsibility for 50% of the revenue of AlumniFinder.  Mr. King was a key

employee of AccuData and was the face of the AlumniFinder business for a

significant number of AlumniFinder's largest clients.

Mr. King's Employment Agreement

12.     In October 2005, AccuData merged with PRIMIS Intermediate Holding, Inc.  At

the time of the merger, AccuData and PRIMIS required key employees to sign

Employment Agreements.  Mr. King was a key employee and his continued

employment after the merger was conditioned on his signing an Employment

Agreement.

13.     In exchange for continuing as a high-level employee with the merged company,

Mr. King signed an Employment Agreement dated October 6, 2005.  A true and

accurate copy of the Employment Agreement is attached hereto as Exhibit 1.  In

the Employment Agreement, Mr. King acknowledged that he had certain non-

disclosure, non-solicitation, and non-competition obligations.

14.     For example, when he executed the Employment Agreement, Richard King

acknowledged that:

> the information, observations and data (including trade secrets) obtained by
> him while employed by the Company (including those obtained by him
> while employed by the Company prior to the date of this Agreement and the
> execution of the Merger Agreement) concerning the business or affairs of
> the Company Group and including, but not limited to, the names and
> identity of the Company Group's customers and prospects … of which
> Employee becomes aware during the Employment Period ("Confidential
> Information") are the property of the Company."

Mr. King further agreed not disclose to any person or entity or use for his own

account any of AccuData's Confidential Information, without prior written

consent of the Board.  Employment Agreement, ¶5.

15.     When he executed the Employment Agreement, Mr. King further acknowledged

        that:

> all other proprietary information and all similar or related information
> (whether or not patentable) which relate to the Company Group's actual or
> anticipated business, research and development or existing or future
> products or services and which are conceived, developed or made by the
> Employee (whether alone or jointly with others) while employed by the
> Company Group, whether before or after the date of this Agreement ("Work
> Product"), belong to the Company Group….

Employment Agreement, ¶6.

16.     The Employment Agreement which Mr. King signed also contained a non-

        solicitation provision and non-competition provision, as a means of protecting

        AccuData's trade secrets and confidential information.  The Employment

        Agreement provides in part:

> <u>Non-Solicitation.</u>  Employee acknowledges that during the course of his
> employment with the Company he has, and shall continue to, become
> familiar with the Company Group's trade secrets and with other
> Confidential Information concerning the Company Group, as well as
> special knowledge of the Company Group's relationships with its
> Business Relations (as hereinafter defined).  The Employee further
> acknowledges and agrees (i) that the Company Group has established long
> term, near permanent relationships with its Business Relations and that
> those relationship were developed at great expense and difficulty to the
> Company Group over several years of close and continuing benefit and (ii)
> that the Company Group's relationships with its Business Relations are
> and will continue to be valuable, special and unique assets of the
> Company Group.  In return for the consideration described in this
> Agreement and other good and valuable consideration, the receipt and
> sufficiency of which are hereby acknowledged, and as a condition
> precedent to the Company entering into the Merger Agreement and this
> Agreement, and as an inducement to the Company to do so, the Employee
> hereby represents, warrants, and covenants as follows:
>     (a) During the Employment Period and for one year thereafter (the
> "Nonsolicitation Period"), Employee shall not directly or indirectly
> through another person or entity … (iii) induce or attempt to induce any
> customer, prospect, supplier, licensee, licensor, franchisee or other

business relation of the Company (collectively, the "Business Relations") to cease doing business with the Company, or in any way interfere with the relationship between any such Business Relation and the Company (including, without limitation, making any negative or disparaging statements or communications regarding the Company Group) or (iv) in any manner engage in providing goods or services to these customers or prospects which goods or services are competitive with the businesses of the Company Group.  For purposes of this section, customers or prospects are all individuals, persons or entities that, with respect to the Company's goods and services, have (1) purchased such goods and services at anytime [sic] during the 12 month period preceding the Employee's termination, or (2) are in active discussions with respect to purchasing as of the time of the Employee's termination.

Employment Agreement, ¶7.

17.     Both before and after the merger, as a key employee within AccuData, Mr. King was entrusted with AlumniFinder's confidential and proprietary business and trade secret information.

18.     For example, as a key employee, Mr. King gained intimate knowledge of all of AlumniFinder's clients, partners, and vendors.  He also possessed detailed knowledge about how AlumniFinder's business was positioned in the marketplace. Mr. King was an active participant in AlumniFinder's 2010 planning for sales and marketing.  All of this information belongs to AccuData, and was given to Richard King or developed for AccuData by Richard King solely to allow him to fulfill his job duties.  The information is central to AccuData's business, and is treated confidentially.

## Barbara King

19.     Barbara (Dale) King is Mr. King's wife.  She was employed by AlumniFinder from March 1, 2003 through March 9, 2010.

20.     During her employment with AccuData, Mrs. King served as a Sales

Administrative Assistant, supporting Mr. King's sales efforts.  Mrs. King was

primarily engaged in lead management and account management activity.  On the

lead management side, she would search for prospects, input information into

AlumniFinder's contact management system to complete prospect records, and

contact customers who had demos conducted but had not yet signed up.  She

would activate new users and clients in AlumniFinder's systems, de-activate

users, help clients who had forgotten their passwords, process Purchase Orders,

handle customer billing inquiries, notify clients when demo grace periods had

expired, and perform other similar tasks.

21.     At the beginning of her employment, Mrs. King signed a Non-Disclosure &

Development Agreement which provided, in part:

> 1.  Confidential Information.  Employee understands, admits, and agrees
> that [she] will necessarily become privy to the identity of the Company's
> customers, customer lists, marketing strategies, product plans, intellectual
> property, other confidential plans and structures, and other confidential
> information and trade secrets, and that to the extent Employee is directly or
> indirectly involved in the marketing or sales aspects of the Company's
> business, [she] will necessarily establish a unique and strong personal and
> professional relationship with the Company's customers during the term of
> this Agreement.  Employee agrees and acknowledges that all constitute
> legitimate and protectable business interests of the Company, and are now,
> and even though enhanced by the Employee, will continue to be extremely
> confidential information and thereby exclusive property of the Company.
> Employee agrees that [she] will hold in strictest confidence and not use for
> [her] own benefit, or the benefit of any third party, any such confidential
> information ….

> 2.  Employee Work Product.

> 2.1  Exclusivity.  During the term of this Employee's employment with the
> Company, Employee agrees to work exclusively for the Company.

A true and accurate copy of her Non-Disclosure Agreement is attached hereto as Exhibit 2.

22.     As a condition of employment, each AccuData employee is bound by several policies which are designed to protect AccuData's proprietary and confidential information.

23.     Both Mr. and Mrs. King had access to AccuData's corporate intranet site, ASK, which contains numerous relevant corporate policies.  AccuData's Policies and Practices Manual (P&P Manual), posted on the intranet, contains a Technology Use policy outlining acceptable use of AccuData's information resources, networks, software and hardware.  The policy confirms that accessing AccuData's systems without proper authorization is strictly prohibited, as is disclosing proprietary information without the explicit permission of AccuData and use of AccuData's systems for personal financial gain.  Misuse of AccuData's technology systems is grounds for disciplinary action, up to and including termination of employment.  P&P Manual, pp. 8-9.

Richard King's Medical Leave

24.     On January 11, 2010, Mr. King informed Ms. Corcoran that he was unable to work due to health issues.  During the call, he also told Ms. Corcoran that he wanted to discuss a plan about transitioning out of the organization and "dividing up [his] book."

25.     On January 14, 2010, Ms. Corcoran sent a letter to Mr. King confirming that Mr. King had requested a leave of absence under the Family Medical Leave Act ("FMLA") and that AccuData had granted the request, effective January 12, 2010.

26.     According to instructions both from AccuData and his health care provider, Mr.

        King was not supposed to be performing any work for AlumniFinder during his

        FMLA leave.

27.     During his entire FMLA leave, through the date of his termination, Mr. King

        received a paycheck from AccuData because he was using accrued paid time

        available to him.  Mr. King's gross wages exceeded $190,000 in 2009.

<u>David Manuel's Coverage of Mr. King's Email Traffic</u>

28.     On January 21, AccuData's Director of Human Resources, Peg Moreland,

        confirmed with Mr. King that AccuData would be de-activating his access to

        corporate systems, including his email account, and that Mr. Manuel would be

        covering Mr. King's work during his leave.  That day, AccuData's Vice President

        of IT (Jeff Wilhelm) shut off Mr. King's access to his email account and to

        AccuData's vendor partner system, Accurint.  Mr. King's access to his mailbox

        (both his Microsoft Exchange / Outlook mailbox, as well as his older Lotus

        Domino mailbox) was removed.  The account was still active, however, so that

        customers and prospects could continue to send emails to that account.

29.     In order to cover Mr. King's responsibilities, Mr. Manuel received a blind copy of

        all inbound emails addressed to Mr. King.   Mr. Manuel did not have access to

        Mr. King's email box.  He was not able to access or view any messages that

        would have been contained in Mr. King's Sent Folder, Deleted Folder, or any

        other folder.

30.     On January 27, 2010, Mr. Manuel received a copy of an email directed to Mr.

        King from one of AccuData's clients ("Ms. M.") from an academic institutional

client.[1]  In the email, Ms. M. asked Mr. King about new developments with

"Webrecord."  Webrecord is not a company that is affiliated with AccuData.

When he read the email, Mr. Manuel became concerned about Mr. King's

activities, and he asked Mr. Wilhelm to review Mr. King's email account.

Following that review, it appeared that (other than the January 27th email from

Ms. M.), Mr. King's communications with the client about Webrecord had all

occurred prior to December 23, 2009, while he was still an active employee.

AccuData therefore did not believe at that time that anything inappropriate had

occurred.

31.     Mr. Wilhelm also discovered that Mr. King had sent an email from his AccuData

account to his personal AOL account, rcking3@aol.com, but Mr. Wilhelm did not

find that any critical information had gone to that personal account.

32.     On March 3, 2010, Ms. Moreland contacted Mr. King to request an update

regarding the status of his FMLA leave and his intent to return to work.  During

that call, Mr. King said that he was feeling okay, and had hoped to be better

sooner, but that his doctor was saying that he would need 2 or 3 months of rest.

33.     On March 5, 2010, Mr. Manuel received an email from Mr. King's email in-box

from a client, ("Mr. D."), addressed to Barbara and Richard King.  The email

indicated that on March 4, 2010, Mr. King called Mr. D. and spoke about an

AlumniFinder application.

34.     That day, Mr. Manuel called Mr. D. and confirmed that the client had spoken with

Mr. King on March 4th about his AlumniFinder application.  Mr. Manuel became

---

[1] The names of contacts and clients have been abbreviated in this Complaint and all accompanying Affidavits and have been redacted from all Exhibits in order to preserve and reinforce the confidential and proprietary nature of such information.

concerned that Mr. King was working during his medical leave, contrary to
AccuData's instructions, company policy, and the mandate from Mr. King's
health care provider.  There was no documentation about Mr. King's activities in
the sales system, so Mr. Manuel requested that Mr. Wilhelm review Mr. King's
emails again so that AccuData could better understand Mr. King's contacts with
clients.

35.     As the result of his review, Mr. Wilhelm discovered that on February 26 and
February 27, 2010, more than 120 documents plus attachments were sent from
Richard King's email account (rking@alumnifinder.com) to a personal email
account (alumnifinder1@aol.com).  These documents included confidential and
proprietary reports, security protocols, templates, marketing materials, training
materials, modeling information, information regarding strategies and
AlumniFinder's methods of doing business, pricing information, and more.  The
documents also included a list of all clients who use AccuData's Accurint system.

36.     The documents which Mr. King forwarded to his personal email account contain
critical, detailed information about AccuData's business. The emails were not
simply customer support information, but rather documents that gave a top to
bottom recipe for AccuData's business.

37.     Mr. Wilhelm concluded that Mr. King was able to send these emails to his
personal account by connecting to the Lotus Domino system using the user name
and password belonging to Mrs. King.  As an assistant/ support person for Mr.
King, she had access to his Lotus Domino mail database.  Once Mr. King was

connected to Lotus Domino, using Mrs. King's credentials, he was able to open his email database.

38.     Mr. Wilhelm also discovered that the eFax number that was included on customer applications was forwarding PDFs of the faxes not only to Richard King and Barbara King's AccuData email accounts, but also sending a copy of the fax to the email account alumnifinder1@aol.com.  This is a security breach because AccuData documents were leaving the company's domain.

39.     In light of the fact that Mr. King was on medical leave, he had no reason, and no authorization, to access his email account or AccuData's systems and databases in February 2010.  Mrs. King also had no reason to access Mr. King's email account or to allow him to access his email account and AccuData's systems and databases through her user account.

40.     In light of his representations to AccuData that he was not ready to return to work from his company-approved medical leave and his health care provider's directive that he not work during his leave, Mr. King was not authorized to be accessing AccuData's computer systems or conducting business on behalf of AlumniFinder or AccuData while on medical leave, and he knew that he was not so authorized.

41.     Mr. King's access to AccuData information through Mr. King's email account exceeded his authorization, was contrary AccuData's policies and various contractual obligations, in direct contravention of communications with Mr. King not to work during his leave, and were not in furtherance of any legitimate AccuData business purpose.

42. Mr. King's contact with any AlumniFinder or AccuData customers or prospects during his leave and his efforts to conduct business during that time were contrary to AccuData's policies and various contractual obligations, in direct contravention of instructions to Mr. King not to work, and were not in furtherance of any legitimate AccuData business purpose.

43. Mr. King, aided by Mrs. King, forwarded confidential, trade secret, non-public, proprietary information belonging to AccuData to a personal AOL account without authorization from AccuData. These actions were contrary to AccuData's policies and contractual obligations, in direct contravention of communications with Mr. King not to work, and were not in furtherance of any legitimate AccuData business purpose.

44. As a result of the information obtained on March 5, 2010, AccuData decided to terminate Mr. King's employment on the grounds that, while he was on a medical leave and purportedly unable to work, and without authorization, he repeatedly accessed AccuData's confidential and proprietary business information and that he used AccuData's computer systems to forward a substantial volume of that confidential and proprietary information to an external personal AOL email account. At the time of his actions, Mr. King was simultaneously representing to AccuData that he was unable to work due to a medical condition. Due to the nature and volume of the misappropriated information, and the circumstances under which Mr. King accessed and handled that information, AccuData considered his conduct to be a violation of Mr. King's Employment Agreement, a

breach of his fiduciary duty of loyalty to AccuData, an egregious violation of company policies and procedures, and a violation of state and federal law.

45.     As a result of the information obtained on March 5, 2010, AccuData decided to terminate Mrs. King's employment because she had, without authorization, allowed an employee on a medical leave to access his email account utilizing her user access and to transmit to an external personal email account a substantial volume of confidential and proprietary information belonging to AccuData.  Due to the nature and volume of the misappropriated information and the circumstances under which Mr. and Mrs. King had accessed, or permitted access, to that information, AccuData considered Mrs. King's conduct to be a violation of her contractual obligations to AccuData, as well as a violation of her duty of care and loyalty to AccuData, an egregious violation of company policies and procedures, and a violation of state and federal law.

Termination Meeting

46.     On March 9, 2010, Ms. Corcoran and Mr. Wilhelm traveled to Massachusetts to the home/business office of Mr. and Mrs. King, where Ms. Corcoran advised Mr. King that his employment was terminated.  Because Mrs. King was not present, Ms. Corcoran left a letter advising her that her employment was also terminated.

47.     During the termination meeting, Mr. Wilhelm collected three computers belonging to AccuData, along with certain other company property.

48.     Mr. King refused to allow Mr. Wilhelm to make a mirror image of the personal computers on the premises to confirm the extent to which the personal AOL account had been used to conduct business for AccuData or for a competitor.

49.     Because Mr. King refused to allow Mr. Wilhelm to make a copy of any of his

computers, and in order to protect AccuData's proprietary and confidential

information as much as possible under the circumstances, Mr. Wilhelm requested

that Mr. King delete all company emails from his personal email account.  Mr.

King did delete some files from an AOL account, but Mr. Wilhelm was not given

access to the computer to confirm that all files had been destroyed.  Mr. King only

deleted files accessed from one computer, though there were at least two

computers on the premises.  Mr. King did not delete AccuData files or folders

relating to other personal email accounts, such as [rcking3@aol.com](mailto:rcking3@aol.com). He also did

not destroy, delete, or give Ms. Corcoran or Mr. Wilhelm access to any other

medium where he might have saved files, such as on a flash drive, external drive,

disk or CD, or other electronic storage media.

<u>Mr. King's Wrongful Competition and Solicitation of Clients and Prospects</u>

50.     On March 11, Mr. Manuel called a client whom Mr. King had referenced during

his termination meeting with Ms. Corcoran and Mr. Wilhelm on March 9th.  That

client, "Ms. S." confirmed that Mr. King had been in direct contact with her the

previous week, even though Mr. King was still on a medical leave from

AccuData.

51.     On March 16, 2010, Mr. Manuel received a call from a client ("Ms. R.") who

informed Mr. Manuel that Mr. King had called her earlier in the day.  Mr. King

told Ms. R. that he did not work for AlumniFinder anymore, but that he did have

two new services to offer.  He referred Ms. R. to the services of Webrecord and

Causemunity.

52.   Mr. King is listed as a consultant for Causemunity at least as of February 23, 2010, the date that the website was last updated.  At that time, Mr. King was on a medical leave from AccuData and was communicating to AccuData that he was entirely unable to work.  On information and belief, Causemunity facilitates the sale of products through a portal and returns a percentage of sales to non-profit organizations.

53.   It is clear from Mr. King's communications with Ms. R. about Webrecord that he is attempting to promote services which compete with AlumniFinder.  Mr. King is actively engaged in pitching the services of Webrecord, which tracks people's "internet footprint" as they use Facebook, Twitter and other internet-based sources.  He is positioning Webrecord as an alternative means for universities, colleges, and development officers to capture information about their alumni which they currently receive from AlumniFinder.  Mr. King's conduct is not consistent with his obligations under his Employment Agreement.

54.   Mr. King's contact with Ms. R. on March 16, 2010 also confirms that Mr. King is currently soliciting AccuData clients and using AccuData's confidential information to contact AccuData's primary contacts, in violation of his Employment Agreement.

55.   On March 17, 2010, AccuData learned from a contact at another academic institution that Mr. King had called that institution to discuss a "web footprint" service.  Mr. King's phone call to this university is another example of his promotion of Webrecord as a competitive alternative to AlumniFinder.

56.     In light of the discoveries about Mr. King's unauthorized communications with AccuData's clients during his medical leave and his attempts to promote Webrecord's services to AccuData's clients immediately after his termination, AccuData has begun to review earlier communications that were directed to Mr. King while he was out on leave.  To date, AccuData has discovered an additional email which makes clear that Mr. King had discussed Webrecord's services with other AccuData clients.  In fact, on January 25, one of AccuData's largest clients sent an email to Mr. King, referring to a conversation they had had "several months" earlier in which Mr. King mentioned that he "offer[ed] tools for finding out which social networks our alumni are connected to."  This email, together with the ones located by Mr. Wilhelm in his review on January 27, 2010, leaves no doubt that Mr. King was actively discussing a competitive product with AccuData's customers and prospects in late 2009, while he was still working for, and receiving a pay check from, AccuData.

57.     In light of his current conduct, it is clear that Mr. King was taking steps and planning to provide competitive services to AccuData clients, at least as early as his conversations with Ms. M. in December 2009.

58.     By their conduct, Mr. and Mrs. King have misappropriated highly sensitive, confidential and proprietary information belonging to AccuData, including significantly more detailed information than would be available to any competitor.  Armed with the information that AccuData has meticulously compiled, Barbara and Richard King will have an unfair business advantage in any competitive venture with which they become affiliated.

<u>COUNT I</u>

(Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030 et seq.)

59.     The Plaintiff repeats, realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 58.

60.     Mr. King's computer was a "protected computer" within the meaning the Computer Fraud and Abuse Act.  Mr. King worked out of his home in Cotuit, Massachusetts.  Mr. King regularly used the computer to communicate with AccuData and with AccuData's personnel, customers, vendors and other employees.  Prior to his FMLA leave, Mr. King used his computer to access AccuData's servers and databases.  Mr. King used his computer in or affecting interstate commerce.

61.     Mr. King intentionally accessed his computer and AccuData's severs, email accounts, and databases to download and misappropriate confidential and proprietary information.

62.     Mr. King's access to AccuData's servers, email accounts, and databases was without authorization and exceeded his authorization because he was on a company-approved FMLA leave and was aware that he was not supposed to be performing any work and was also aware that his computer access had been deactivated for the period of his leave.  In order to access AccuData's systems and the confidential and proprietary information they contain, Mr. King had to use his wife's user access, intentionally circumventing AccuData's controls such that he knew that his access was beyond the scope of his then-existing authority.

63.     Mrs. King's grant of access to Mr. King to AccuData's servers, email accounts, and databases was without authorization and exceeded her authorization.  Mrs.

King was aware that Mr. King was not supposed to be performing any work because he was on a company-approved medical leave.  She was aware that Mr. King's computer access had been deactivated as a result of his FMLA leave. Mrs. King was also aware that in order for Mr. King to access AccuData's systems, Mr. King had to use her user access and intentionally circumvent AccuData's controls.  It was clearly beyond Mrs. King's authority to permit Mr. King to obtain access to the computer systems and the confidential and proprietary information they contain in this manner.

64.     Mr. King's access constitutes a breach of his fiduciary duties, and Mrs. King, through her conduct, aided and abetted said breach.

65.     Mr. King's and Mrs. King's intentional and unlawful conduct caused damage and losses in excess of $5,000.  Specifically, AccuData's damages include, but are not limited to, the costs of hiring a forensic expert to examine and assess the scope of damage caused by Defendants' conduct and to restore the integrity of the data if necessary, as well as the cost of hours spent away from day-to-day responsibilities, including travel costs required to conduct the termination meeting, to retrieve and protect the confidential and proprietary information which has been compromised by the conduct of Mr. and Mrs. King.

## COUNT II

(Violation of Mass. G.L. c. 93, §42,
Misappropriation of Trade Secret Information v. Defendants)

66.     The Plaintiff repeats, realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 65.

67.    Mass. G.L. c. 93, § 42 provides, inter alia, that whoever steals, unlawfully takes, copies by fraud or deception obtains, from any person or corporation, with intent to convert to his own use, a trade secret, regardless of value shall be liable in tort to said corporation or individual for damages in an amount up to double those found. The statute defines a "trade secret" as including, but not limited to, anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records secret merchandising or management information, procedure or improvement."

68.    AccuData has engaged in reasonable efforts to maintain the confidentiality and secrecy of its trade secrets that have been stolen by Defendants.

69.    Defendants had a statutory obligation not to convert or misappropriate AccuData's trade secrets for his benefit or the benefit of any third party.

70.    Defendants have stolen, unlawfully taken, concealed, and/or copied AccuData's trade secrets and confidential and proprietary information by fraud or deception with the intent to convert the information to their own use and/or the use of third parties.

71.    Defendants used improper means, including misrepresentation, deception, and breach of duty to misappropriate AccuData's trade secrets.  Such information has actual, potential, and independent economic value to AccuData because it is not generally known to, and is not readily ascertainable by, AccuData's competitors.

72.    Defendants knew or had reason to know that Mr. King's access to and acquisition of AccuData's trade secrets was improper.

73. Defendants, acting alone or in concert with others, have used or intend to convert for their own use AccuData's trade secrets without express or implied consent from AccuData and for the improper purpose of interfering with AccuData's business.

74. Defendants' conduct constitutes a violation of Mass. G.L. c. 93, § 42.

75. As a result of Defendants' unlawful conduct, AccuData has suffered and will continue to suffer irreparable harm and monetary damages, including damages for both the actual losses caused by Defendants' conduct, for the unjust enrichment caused by the misappropriation, as well as attorneys' fees, costs, and multiple damages.

76. Defendants' misappropriation, disclosure, and use of AccuData's confidential information or trade secrets was willful, in bad faith, and malicious, warranting an award double the amount of plaintiff's actual damages, plus attorneys' fees.

### COUNT III
(Breach of Contract v. Barbara King)

77. The Plaintiff repeats, realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 76.

78. Barbara King had express and implied contractual obligations and covenants not to misappropriate AccuData's trade secrets, and to maintain the confidential nature of AccuData's proprietary information.

79. By her conduct, Barbara King breached her express and implied contractual obligations and covenants to AccuData, causing AccuData damages in an amount to be determined at trial.

### COUNT IV

(Breach of Contract v. Richard King)

80.   The Plaintiff repeats, realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 79.

81.   Richard King had express and implied contractual obligations and covenants to preserve and not use AccuData's confidential information.

82.   By his conduct, Richard King breached his express and implied contractual obligations and covenants to AccuData, causing AccuData damages in an amount to be determined at trial.

COUNT V
(Breach of Fiduciary Duty/ Duty of Loyalty v. Richard King)

83.   The Plaintiff repeats, realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 82.

84.   As a trusted and high-ranking employee of AccuData, privy to AccuData's trade secrets and confidential information, Richard King owed AccuData fiduciary duties of loyalty to act in the best interests of AccuData.  Among other things, Mr. King was obligated not to circumvent Company data security controls, not to misappropriate confidential information and trade secrets, not to use AccuData's trade secrets or proprietary and confidential business information to advance his own competitive interests or the services of another competitor, and not to continue receiving compensation from AccuData while breaching his duties.

85.   Mr. King was in a position of trust and confidence at AccuData and he owed a fiduciary obligation to act in the best interests of AccuData at all times during his employment.  Mr. King breached his fiduciary obligations by engaging in a concerted effort to circumvent AccuData's data security protections, to gain

unauthorized access to AccuData's system, to misappropriate AccuData's confidential information, and to pursue competitive interests while still employed by AccuData.

86.    Mr. King actively deceived AccuData by continuing to pursue his medical leave and to represent to AccuData that his doctor was recommending two or three months' rest, and the next day communicating with a client or prospect on a business matter.

87.    By his conduct, Richard King abused and betrayed AccuData's confidences and did not act in good faith and with due care regarding AccuData's interests.

88.    By his conduct, Richard King breached his fiduciary duty of loyalty to AccuData.

89.    Richard King's conduct has caused and will continue to cause AccuData irreparable harm and monetary damages, in an amount to be determined at trial, but including the recoupment by AccuData of all salary paid to him during the period of his breach.

<u>COUNT VI</u>
(Aiding and Abetting Breach of Fiduciary Duty v. Barbara King)

90.    The Plaintiff repeats, realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 89.

91.    At all material times, Barbara King was aware that Richard King owed fiduciary duties to AccuData.

92.    Richard King breached his fiduciary duties to AccuData, as described above.

93.    Barbara King knew of, facilitated, and participated in Richard King's breaches of fiduciary duty.

94.     Barbara King has aided and abetted Richard King's breaches of fiduciary duties

        by acting in concert with him in committing the foregoing breaches.

95.     Barbara King's conduct has caused and will continue to cause AccuData

        irreparable harm and monetary damages, in an amount to be determined at trial.

COUNT VII
(Breach of the Implied Covenant of Good Faith and Fair Dealing v. Defendants)

96.     The Plaintiff repeats, realleges and incorporates by reference herein the

        allegations contained in paragraphs 1 through 95.

97.     Implicit in their employment relationship with AccuData, Mr. King and Mrs.

        King were obligated to act in good faith and fairly towards AccuData.

98.     By their conduct described above, Defendants breached the implied covenant of

        good faith and fair dealing implicit in their employment relationship.

99.     AccuData has been harmed by Defendants' conduct and seeks an award of

        damages in an amount to be determined at trial.

COUNT VIII

(Injunctive Relief v. Defendants, Mass. G.L. c. 93, §42A)

100.    The Plaintiff repeats, realleges and incorporates by reference herein the

        allegations contained in paragraphs 1 through 99.

101.    As a result of Defendants' conduct, they have caused, and are poised to continue

        to cause, irreparable harm to AccuData, including by obtaining an unfair

        competitive advantage over AccuData.

102.    Notwithstanding Mr. King's duty to preserve the confidentiality of AccuData's

        confidential and proprietary information, Mr. King will, unless enjoined, continue

to use misappropriated confidential information and trade secrets from AccuData

for his benefit or the benefit of third parties, including Webrecord.

103.    Paragraph 7(c) of Mr. King's Employment Agreement provides:

In the event of the breach or a threatened breach by Employee of any of the
provisions of this Section 7, the Company would suffer irreparable harm, and in
addition and supplementary to other rights and remedies existing in its favor, the
Company shall be entitled to specific performance and/or injunctive or other
equitable relief from a court of competent jurisdiction in order to enforce or
prevent any violations of the provisions hereof (without posting a bond or other
security).  In addition, in the event of an alleged breach or violation by Employee
of this Section 7, the Nonsolicitation Period shall be tolled until such breach or
violation has been duly cured.

104.    Pursuant to Mass. G.L. c. 93, § 42A and Mass. R. Civ. P. 65, AccuData is entitled

to preliminary and permanent injunctive relief to prohibit Defendants from

disclosing or using AccuData's trade secrets or confidential business information

and requiring them to return immediately all AccuData confidential business

information and trade secrets in their possession, custody or control, and to certify

their compliance with this requirement.

105.    The actions by Barbara King and Richard King have and will continue to have a

material and adverse effect upon AccuData's businesses, particularly in this

economy and in this highly competitive industry.  The monetary damages

sustained by AccuData as a result of the conduct of Barbara King and Richard

King are not subject to exact calculation, and unless Barbara King and Richard

King are restrained, AccuData will suffer irreparable harm.

## PRAYERS FOR RELIEF

WHEREFORE, AccuData, respectfully prays:

1.      That the Court enter a preliminary injunction pursuant to 18 U.S.C. §1030,
Mass. G.L. c. 93, §42A and Mass. R. Civ. P. 65 in favor of the Plaintiff,

and against Defendants, under Count VIII of the Complaint enjoining Defendants from disclosing or using for their benefit or the benefit of any third party any confidential or proprietary information or trade secrets belonging to AccuData;

2.     That the Court enter a preliminary injunction in favor of the Plaintiff, and against Defendants, under Count VIII of the Complaint ordering Defendants to turn over all information and property belonging to AccuData, including any proprietary or confidential information or trade secrets misappropriated from AccuData;

3.     That the Court enter a preliminary injunction in favor of the Plaintiff, and against Defendants, under Count VIII of the Complaint ordering Defendants to turn over all computers and electronic storage media in their possession, custody, or control to a third-party computer forensic vendor approved by AccuData for analysis and examination and to ensure removal of all AccuData confidential and proprietary information;

4.     That the Court enter a preliminary injunction in favor of the Plaintiff, under Count VIII of the Complaint enjoining Richard King and all persons or entities acting in concert with him, for a period of one (1) year from the Court's Order, from inducing or attempting to induce any AlumniFinder customer, prospect, supplier, licensee, licensor, or franchisee to cease doing business with AlumniFinder or in any way interfere with the relationship between AlumniFinder and that person or entity;

5.     That the Court enter a preliminary injunction in favor of the Plaintiff, under Count VIII of the Complaint enjoining Richard King and all persons or entities acting in concert with him, for a period of one (1) year from the Court's Order, from providing any goods or services to any customer, prospect, supplier, licensee, licensor, or franchisee of AlumniFinder, which goods are competitive with the business of AlumniFinder;

6.     That Judgment enter in favor of the Plaintiff, and against Defendants, under Count I of the Complaint, awarding to Plaintiff and directing Defendants immediately to pay, damages resulting from their violation of the Computer Fraud and Abuse Act;

7.     That Judgment enter in favor of the Plaintiff, and against Defendants, under Count II of the Complaint, awarding to Plaintiff and directing Defendants immediately to pay, damages resulting from their violation of Mass. G.L. c. 93, §42 and their willful and malicious misappropriation of confidential and trade secret information, plus multiple damages, costs and attorney's fees;

8.     That Judgment enter in favor of the Plaintiff, and against Defendants, under Count III of the Complaint, awarding to Plaintiff and directing Barbara King immediately to pay, damages resulting from her breaches of contract;

9.     That Judgment enter in favor of the Plaintiff, and against Defendants, under Count IV of the Complaint, awarding to Plaintiff and directing Richard King immediately to pay, damages resulting from his breaches of contract;

10.     That Judgment enter in favor of the Plaintiff, and against Defendants, under Count V of the Complaint, awarding to Plaintiff and directing Defendants immediately to pay, damages resulting from Richard King's breaches of fiduciary duty;

11.     That Judgment enter in favor of the Plaintiff, and against Defendants, under Count VI of the Complaint, awarding to Plaintiff and directing Defendants immediately to pay, damages resulting from Barbara King's aiding and abetting of Richard King's breaches of fiduciary duty;

12.     That Judgment enter in favor of the Plaintiff, and against Defendants, under Count VII of the Complaint, awarding to Plaintiff and directing Defendants immediately to pay, damages resulting from their breaches of the covenant of good faith and fair dealing; and

13.     That this Court grant to the Plaintiff such other and further relief as is just and proper in the circumstances.

Market Models, Inc., d/b/a AccuData Integrated
Marketing,


By its attorneys,


 /s/  Karen A. Whitley
Charles R. Bennett, Jr. (BBO# 037380)
Karen A. Whitley    (BBO# 564742)
HANIFY & KING, Professional Corporation
One Beacon Street
Boston, MA  02108
Phone: (617) 423-0400
Fax:  (617) 423-0498
crb@hanify.com
kaw@hanify.com

Dated: March 19, 2010

## CERTIFICATE OF SERVICE

I hereby certify that, pursuant to Federal Rules of Civil Procedure 4(e), a true copy of the above Complaint will be filed on Defendants Richard King and Barbara (Dale) King by hand or other means permitted by the Rules.  Proof of such service will be filed in accordance with Federal Rule of Civil Procedure 4(l).


_____/s/ Karen A. Whitley_____

556841